REED v. CROPP CONCRETE MACHINERY CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.
Rehearing Denied May 25, 1915.)

No. 2082.

1. PATENTS ⬨328—VALIDITY AND INFRINGEMENT—CONCRETE MIXER.

The Reed patent, No. 939,629, for a concrete mixer, *held* to disclose patentable invention, although the improvement it embodies consists chiefly in the substitution for the manually operated lever of the prior art for the swinging or closure of the blades and gate of a partially automatic mechanism containing a coiled spring, old in other arts, but which in the patented machine greatly increases its efficiency; also *held* infringed.

2. PATENTS ⬨312—SUIT FOR INFRINGEMENT—ISSUES AND PROOF.

In an infringement suit against a corporation and its president as joint infringers, where the joint answer of defendants alleges that the patented machine had been used by the individual defendant prior to the application for the patent, and that he was the inventor of the same, where the proof fails to sustain such allegation, there is such an admission of infringement by the individual defendant as entitles the complainant to a decree against him.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. ⬨312.]

Appeal from the District Court of the United States for the Northern District of Illinois; Christian C. Kohlsaat, Judge.

Suit in equity by Matthew Howard Reed against the Cropp Concrete Machinery Company and Andrew J. Cropp. Decree for defendants, and complainant appeals. Reversed.

Appellant, Reed, the grantee of letters patent 939,629, issued November 9, 1909, covering an improvement in concrete mixers, filed his bill against defendants, charging joint infringement. Upon final hearing, the determination by the court below that the patent is void for want of patentable novelty, resulted in a decree dismissing the bill, from which this appeal is taken.

Charles M. Clarke, of Pittsburgh, Pa., for appellant.
Glenn S. Noble, of Chicago, Ill., for appellee.

Before BAKER and SEAMAN, Circuit Judges, and GEIGER, District Judge.

GEIGER, District Judge. [1] The rotary mixing drum is an appliance well known and generally used in the preparation of concrete

mixtures. Reed's patent covers an improvement in such a mixer, particularly in the mechanism for actuating the charging blades or the covering gate for the delivering chute. His object is thus stated:

*** * * To provide means for operating the blades or gate and also for holding the blades in mixing or charging position and for holding the gate open or closed and providing for operating either from either end of the mixer drum by means of a lever and spring mechanism."

The invention is thus described by the patentee:

"Referring to the drawings: Figure 1 is a view in front elevation of the mixer drum and portions of its supporting and rotating mechanism. Fig. 2 is a view of the drum from the back. Fig. 3 is a horizontal section on the line *III, III*, of Fig. 1. Fig. 4 is a vertical sectional view on the line *IV, IV*, of Fig. 1, partly broken away. * * *

"In the drawings *2* represents the drum of cylindrical form, having a rear annular receiving chamber *3* between a back annular flange *4* and a rear partition *5*. Partition *5* is provided with a centrally arranged inlet opening *6*, and the shell between partition **5 and flange** *4* has any suitable lifting mech-

anism, not shown, such as those shown in my prior application filed September 28, 1908, Serial No. 455,101.

"The front wall 7 of the drum is provided with a centrally arranged outlet opening defined by the delivery chute 8, which in the position shown in Fig. 1 slopes downwardly and terminates in upper horizontal edges 9, and opens into the interior or mixing compartment of the drum.

"The delivery chute is provided with a closing door or cover 10 entirely within the mixing chamber and immediately behind the front wall 7, mounted on a hinge rod 11 pivotally carried in suitable bearings in the front and back wall respectively. Rod 11 is provided at the front with an operating lever 12 and at the back with a similar operating lever 13 secured in any suitable manner, and these levers are so located that, when the gate is thrown open, the levers will occupy the positions in dotted lines in Figs. 1 and 2, the rear lever 13 extending across the opening 6. By this construction the gate may be operated by the lever at either end, and the position of the rear lever will always indicate to the workman whether the gate is open or closed. When open, the material will pass through the chute, and when closed will be deflected away therefrom to other portions of the mixer.

"For the purpose of positively holding the gate in either open or closed position, I provide a tension spring 14 secured at one end by any suitable attachment, as a bolt 15, preferably provided with a nut by which it may be adjusted in its bearing to tighten or loosen the spring. 16 is a link connecting spring 14 with lever 12, or arc shape as shown, so that when the lever is thrown downwardly into the position shown in dotted lines for opening the gate, the arc-shaped link 16 will reach around the end of shaft 11 without interference, as clearly shown.

"The point of attachment of link 16 with lever 12, is designed to pass beyond the dead center alignment with shaft 11 sufficiently far to insure a pull of the spring on the other side to positively hold the gate raised, as will be readily understood, while the normal tension of the spring in the closed position of the gate, tends to maintain it closed. By this construction it will be seen that the gate may be open or closed from either end by operating either lever 12 or 13, and will remain in either position against accidental shift or motion.

"Ordinarily, the gate lies down upon the top edges of chute 8 as indicated in the principal figures of the drawings."

Permissible modifications of the structure—also disclosed and claimed—need not, in view of the issue, be noted. The controverted claims of the patent are:

"1. A rotary concrete mixer drum provided in its interior with an adjustable material-deflecting element having a limited range of movement, a rocking shaft extending longitudinally of the drum carrying said element and having an operating lever, and spring mechanism connected with the drum and lever adapted to positively hold the lever, shaft and deflecting element when thrown to the limit of movement in either direction, substantially as set forth.

"2. A rotary concrete mixer drum provided in its interior with an adjustable material-deflecting element having a limited range of movement, a rocking shaft extending longitudinally of the drum carrying said element and having an operating lever and spring mechanism connected with the drum having an arc-shaped terminal engaging the lever and adapted to positively hold it and the shaft and deflecting element when thrown to the limit of movement in either direction, substantially as set forth."

"4. A rotary concrete mixer drum provided in its interior with an adjustable material-deflecting element having a limited range of movement, a rocking shaft extending longitudinally of the drum carrying said element and having an operating lever at its end, and spring mechanism embodying an arc-chaped portion connected with said lever adapted to exert tension thereon to positively hold the lever, shaft and deflecting element when thrown to the limit of movement in either direction, substantially as set forth."

If successful challenge of validity depended upon the inventor's selection of spring mechanisms found in other arts, e. g., those used for

closing rainwater pipes, door hinges, cabinet file covers, box covers, mowing machines, the proofs here would sustain the decree. But if notice be taken of the state of the particular art involved, of the endeavors of others therein, or the advance made by the patented mechanism in suit, its conceded utility and efficiency in promoting expedition and economy in operation, we believe a different view must be entertained. Two patentees, Ransome, No. 322,006, July 14, 1885, and McKelvey, No. 751,541, February 5, 1904, each recognized as pioneer and resourceful in the concrete mixing machinery art, are the only ones whose endeavors in the solution of the problem approached by Reed need be considered. Their respective structures—in the particulars claimed to be relevant—are thus illustrated:

### (1) Ransome.

It will be observed that the patentee adopted as a means for actuating the blades which are found within the drum mounted upon the shaft $g$, the lever $g'$ mounted upon the quadrant $g^2$, which latter is notched, as indicated, to receive and hold the lever at different angles. That such was his purpose is declared by him in his specification:

*Fig. 4.*

"By moving the handle $g'$ the flanges (within the drum) may be made to lie down close to the surface of the drum as they may be moved to extend inwardly at a suitable angle to enable them to lift the material."

### (2) McKelvey.

The mechanism here is the double-ended spring $E$ with locking shoulders $E'$, the latter for engaging the pin $d^3$ of lever $d^2$ at the limit of its movement in either direction. It will be noted that the lever $d^3$ actuates the shaft $d$ upon which the gate $D$ hangs.

Ransome's disclosure in the particular above set forth was not covered by any claim of his patent; while McKelvey included, as an element of his combination "means for swinging" the gate and "catches on said drum to engage said rod

*Fig. 2.*

(the pin $3$, supra) when the gate is swung to its extreme positions."

Of course, in passing upon the quality of Reed's mechanism, and in its comparison with Ransome and McKelvey, it must be borne in mind that the merit of a concrete mixing machine is measured almost wholly

by the degree to which it efficiently saves labor; and, obviously, the expedition with which the mixture may be lifted and discharged from the drum is of no small importance. Each of the three inventors had before him the same problem, and we find that Ransome and McKelvey offer no solution, save through the manual operation of the lever for swinging or closure of the blades or the gate. Reed's solution, on the other hand, involves and perfects—at least as to one-half of the function—the idea of automatic accomplishment. Neither of the former suggests the possibility of swinging the blade or gate through its entire range of movement other than by the continued manual act of the operator. It may be that Reed's tension spring, in so far as it holds the gate at either limit of movement, discharges equivalently the function of McKelvey's catch spring; but his introduction of the arc-shaped link into combination with the lever, spring, and shaft, and his mounting of the entire mechanism to enable throwing the lever past the dead center of pull and thereby automatically discharge what remains of the whole function, is, in our judgment, not only novel, but embodies the dignity of invention. The case is not distinguishable from Western Electric Co. v. Larue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294, wherein Larue, who substituted a torsional spring—well known in other arts—for the ordinary pivotal supports for keys in telegraphic instruments, was held to be an inventor. In view of the obvious and beneficially new result accomplished by Reed, the suggestion that Ransome did not "detail a spring or yielding mechanism because he * * * knew that any mechanic having any skill in the art would understand how to put a spring handle, or a spring dog, on to hold the handle in adjusted position," and the further suggestion that McKelvey's structure might be reorganized mechanically by attaching Abell's (mowing machine) tension spring, serve, not to detract from Reed's disclosure, but rather as criticisms of his predecessors in the art.

We therefore conclude that each of the three claims in controversy, interpreted to embody the particular elements of the mechanism disclosed in the drawings and specification, viz., the tension spring, the arc-shaped link or terminal, with the lever, is valid.

A contention is further advanced that the claims are void for lack of illustration and description in this: Each refers to the spring mechanism adapted to *positively* hold the lever and the gate when thrown to either limit of movement; but the disclosure in the drawings is of a *yielding* device to hold the door. It is urged that McKelvey's showing of a *positive lock* must be taken as definitive of the term "positively hold" as used by Reed. Of course, if "positively holding" the gate includes "locking" it by some contrivance such as a notch or a peg, there might be merit in the contention. But this interpretation of Reed's language is neither required nor could it have been intended. Whether a spring will "positively hold" depends upon the degree of its tension; and, fairly interpreted, these claims refer to a spring mechanism of sufficient strength to hold the gate to enable discharge of the functions successively to be performed by the machine.

[2] It is urged by defendants that proof of infringement is lacking.

It is evident from the record that this issue was not pressed by either party. However, complainant's proofs of defendant's exhibition of an infringing machine, the identification of certain machines which, by fair inference, are chargeable to the defendant corporation as manufacturer and seller, were sufficient to at least cast upon it the burden of counter proofs; and, no such proof appearing, a decree against such defendant is warranted. On behalf of the individual defendant, Cropp, who is the president of the corporate codefendant, it is insisted that. as joint infringement is charged, such individual defendant must be dismissed, because, in the absence of proof, his act will be deemed to be in discharge of a corporate duty. Cazier v. Mackie-Lovejoy Co., 138 Fed. 654, 71 C. C. A. 104. But defendants in a joint answer, wherein they deny infringement, also affirmatively charge that complainant obtained his patent fraudulently, viz.:

"These defendants aver that the said * * * Reed, *well knowing that the said Andrew J. Cropp, one of the defendants herein, had previously used the alleged invention of said letters patent,* and having received instructions and explanations regarding said alleged invention from said Andrew J. Cropp, did unlawfully and fraudulently apply for letters patent," etc.

The issue tendered by such allegation was not supported by any proof. Now, the burden of proving infringement, joint or other, was upon complainant; and if defendants had stood upon an answer containing a simple denial, the defendant Cropp might, upon such record, ask for dismissal for lack of proof. But his answer is responsive to the bill, by way of admission of his own trespass, which, under the answer, presumptively continued down to the time suit was commenced. He did not, as he might, respond to the infringement charge by admitting his act, and, by further allegation, give it corporate color or complexion, thus exempting himself under the rule above noted. He confessed, but did not avoid. The latter was *his* duty, not complainant's; and the admission contained in such answer furnishes a sufficient basis for joining him in the decree.

The decree is reversed, with directions to enter a decree in favor of the complainant against the defendants.