**PANTHER PUMPS & EQUIPMENT CO., INC., Plaintiff-Appellee,**

v.

**HYDROCRAFT, INC., et al., Defendants-Appellants.**

No. 71–1125.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1972.

Decided Oct. 24, 1972.

Rehearing Denied Nov. 16, 1972.

Arthur T. Susman, Alvin D. Shulman, Chicago, Ill., for defendants-appellants.

Roy E. Petherbridge, John M. O'Neill, Edward D. Gilhooly, Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

A jury found one claim in each of two patents[1] owned by plaintiff valid and infringed by defendants' paint spray unit and awarded damages of $150,000 against the corporate defendant and $5,000 against each of the two individual defendants.

This appeal raises six separate issues: (1) whether the court erred as a matter of law or abused its discretion by refusing to submit 32 special interrogatories to the jury; (2) whether the court permitted the jury to find infringement of a dependent claim after ruling that the claim from which it depends is not infringed; (3) whether a claim on an apparatus designed to avoid overheating by means of "cavitation cooling" can be infringed by a pump which operates at an increased temperature on standby; (4) whether the fact that one of plaintiff's licensees agreed not to contest the validity of the patent is a "misuse" which forecloses any relief against infringers; (5) whether the damage award against the corporate defendant is excessive; and (6) whether separate recovery against the individual defendants is proper. Except for the last point, we find no merit in defendants' appeal. Only a brief statement of the facts is necessary as a preface to our discussion of the issues.

The claims describe a hydraulic pump used to operate a paint spray gun. Spray painting normally is an intermittent operation; frequently, instead of turning off the entire unit when spraying is discontinued, the pump continues to operate on "standby." The patented invention improves the efficiency of standby operation.

The apparatus contains one chamber housing the "driving fluid" and another containing the paint, or "pumped fluid." The standby operation is designed to permit the immediate resumption of spraying without permitting the continued operation of the power source in the driving fluid chamber to cause a substantial buildup of pressure or temperature when the gun is not spraying paint. In the prior art, overheating of the driv-

---

1. Claim 23 of Patent No. 3,254,845 relating to "fluid power transfer apparatus" issued on June 7, 1966; and claim 19 of Patent No. 3,367,270 issued on February 6, 1968. Both patents issued to Panther Pumps & Equipment Company, Inc., as assignee of Paul W. Schlosser.

ing fluid was avoided by recirculation of that fluid through bulky auxiliary equipment which included heat exchange apparatus such as a relatively large cooling tank. Much of that auxiliary equipment may be eliminated by the use of the patented invention which takes advantage of the cooling effect which occurs when liquid is evaporated. By creating a partial vacuum, or "cavitation," in the driving liquid chamber, some of the liquid vaporizes and produces "cavitation cooling." Some of the bulk and inefficiency of prior art pumps is thereby obviated.

Schlosser and Drath, the two individual defendants, are former employees of the plaintiff. Schlosser conceived the patented invention and assigned it to plaintiff while still in plaintiff's employ. Subsequently, he, Drath, and a third party organized the defendant corporation and in due course developed the infringing models which are manufactured and sold by the corporate defendant. This simple history, stressed repeatedly during the trial, may explain plaintiff's unusual decision to demand a jury trial in a patent case.

I.

Defendants challenge the manner in which the case was submitted to the jury. Defendants do not argue that it was error to submit either the entire case or any specific issue to the jury.[2] The contention is not that the jury was permitted to decide questions of law; rather, it is argued that in view of the

way the jury verdict was reached, it is impossible for a reviewing court to determine whether the three-step analysis required by Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545, was properly made.

As defendants phrase their argument, "The Legal Conclusion On Patent Validity Must Be Reversed For Failure To Give Verbal Expression To The Required Factual Determinations."[3] Defendants argue that "without such findings, there is no way for a reviewing court to determine whether the correct legal standard was applied."[4]

 Unquestionably, the issue of validity is a question of law. Moreover, as this court squarely held after considering the matter en banc, the issue of obviousness is also a question of law. Armour & Co. v. Wilson & Co., 274 F.2d 143, 151–157 (7th Cir. 1960). But we also concluded in Armour that "the rules governing the trial of patent cases are no different than in other types of civil litigation, and further, that the scope of our review on appeal follows the same pattern." Id. at 157.[5]

 In a patent case, as in any other case tried to a jury, questions of law are for the court and questions of fact are for the jury.[6] Our rules do not contemplate that a jury may be asked to make the kind of detailed findings of fact which Rule 52(a) of the Federal Rules of Civil Procedure requires of a judge who sits without a jury. Therefore, if defendants are, in effect, argu-

2. All issues relating to validity and infringement were treated as issues of fact and submitted to the jury with four special interrogatories. The special interrogatories asked whether each of the two claimed patents were valid and whether they were infringed.

3. Appellants' brief, p. 17.

4. Id. at 16.

5. In stating the question before the en banc court in that case, Judge Hastings also pointed out that "it can hardly be resolved in such abstract terms limited to patent litigation. It can better be considered in the light of our appellate re-

view of civil litigation generally." 274 F.2d at 151.

6. We note that both parties and the court confused issues of fact with issues of law. For example, defendants' requested special interrogatory number 27 reads as follows:
 "27. If the answer to Interrogatory No. 26 is 'no', would the claimed invention of U.S. Patent No. 3,367,270 have been obvious to to one skilled in the art of piston-diaphragm pumps and who had all the prior art before him, including British Simpson Patent No. 887,-774?"

ing that such findings must be made by a jury in a patent case, the argument is unacceptable.

■ In the normal jury trial, allocation between judge and jury of their respective decisional responsibilities may be accomplished by the use of special interrogatories or special verdicts, or by the court's instructions to the jury before it returns a general verdict. Which method is appropriate in a particular case is a matter to be determined by the wise discretion of the trial court in the circumstances of the particular litigation before it. When only two or three narrow issues of fact, such as the date of invention or perhaps the date of first public sale, determine the issue of patent validity, it may be entirely appropriate to submit special interrogatories to the jury. But if, as in this case, one party contends that as many as 32 separate fact questions must be resolved, the trial judge certainly may consider it inappropriate to use the special interrogatory procedure.[7]

■ In this case, the trial judge was not required, as a matter of law, to submit special interrogatories to the jury, and we hold that he did not abuse his discretion in refusing to do so.

■ This holding does not mean, as defendants contend, that the legal conclusion on patent validity may not be reviewed under the John Deere guidelines whenever a jury returns a general ver-

dict. As in any other jury trial, the court's rulings on questions of law are subject to review. If the ultimate issue of validity depends on subsidiary fact questions, it is the court's duty to instruct the jury that it should return one verdict if the facts are found one way and a different verdict if the facts are found otherwise.[8] In such event, as in other cases tried to a jury, the reviewing court will presume that the disputed matters of fact have been resolved favorably to the prevailing party in accordance with the trial judge's instructions.

The task of giving error-free instructions in a patent case may indeed be extremely difficult.[9] But we are not asked in this case to consider whether the instructions to the jury were improper in any respect. We therefore have no occasion to express any opinion about the adequacy of the instructions as a whole, or any specific instruction which may have been given over the objection of the losing party.[10]

We therefore find no merit in the attack which appellants have made on the procedure followed by the trial judge in submitting this case to the jury.

II.

■ Each of the infringed claims depends from a broader claim. Thus, claim 23 of the '845 patent reads:

"23. A fluid power transfer apparatus substantially as set forth in

---

7. The trial judge made it clear that he thought the use of 32 special interrogatories would confuse the jury. A. 59 (quoting transcript of June 17, 1970, at 19).

8. Of course, if there are no disputed fact issues affecting validity, the court may simply instruct the jury that the patent is either valid or invalid.

9. Presumably this is only one of the many reasons why members of the Patent Bar have wisely avoided jury trials in patent litigation. "Most patent cases are tried to the court. In fiscal 1968, 1969, and 1970, the total number of patent cases going to trial and the number of patent cases going to juries were, respectively: 1968—131, 2; 1969—132, 8; and 1970—

119, 3. Annual Report 1968–1970, Table C–8." Blonder-Tongue Laboratories, Inc. v. University Foundation, 402 U.S. 313, 336, 91 S.Ct. 1434, 1447, 28 L.Ed.2d 788.

10. No argument directed at the form of the instructions has been advanced by appellants. Indeed, prior to oral argument the instructions were not even made a part of the record on appeal. Four days after argument, appellants filed a motion to amend the record by the addition of the instructions. We have granted that motion. However, we refuse to consider any issues raised for the first time after oral argument, particularly since appellants' belated attack on the instructions amounts to little more than a general invitation to review the record in search of error.

claim 22, said prime mover being a pump, and said variable load material being a paint spray gun."

Claim 22, in turn, depends from claim 1 of the '845 patent,[11] and claim 19 of the '270 patent depends from claim 12.[12] It is clear as defendants argue, that a product which did not infringe claim 22 of the '845 patent could not infringe claim 23. Thus, if the court made a final adjudication of noninfringement of claims 1 and 22 of the '845 patent and claim 12 of the '270 patent, such an adjudication would foreclose recovery for infringement of the claims in suit.

■ Defendants contend that the district court's direction of a verdict against plaintiff on all claims except 23 of '845 and 19 of '270 should be so construed. The record clearly establishes, however, that the trial judge merely intended to preclude recovery on any claim except insofar as it was incorporated by reference in claims 23 and 19. Thus, to the extent that infringement of claims 1 and 22 of the '845 patent was an essential element of plaintiff's proof of infringement of claim 23, the judge's ruling was not intended to foreclose that element of plaintiff's case. We do not construe the judge's action, as explained in the colloquies which preceded his direction of a verdict on all claims except 23 and 19, portions of which are set forth in the margin, as an adjudication of noninfringement of the broader claims incorporated by reference in the infringed claim. [13]

---

11. Claims 22 and 1 of patent '845 read as follows:

"22. A fluid power transfer apparatus substantially as set forth in claim 1 including a variable load material in combination with said housing, and wherein said movable means is a prime mover for moving said variable load material, said drive fluid is a liquid disposed between said prime mover and said variable load comprising relatively incompressible liquid means interposed between said prime mover and said variable load material and means responsive to variations of the variable load material being driven for controlling a conditions establishing driving and non-driving relationships of said prime mover and said variable load material, said non-driving relationship being characterized by cyclic vaporizing and condensing of said liquid whereby to limit horsepower consumption of said prime mover."

"1. A fluid power transfer apparatus including a housing defining chamber, a driving fluid in said chamber, said fluid having reversible vapor and liquid phases, and movable means for alternately applying and removing pressure forces to and from said fluid to cause reversal between said phases."

12. Claims 19 and 12 of the '270 patent read as follows:

"19. The liquid driven diaphragm fluid pump of claim 12 wherein the reciprocating piston comprises a power means for driving a variable capacity load of pumped liquid, a driving liquid disposed between said reciprocating piston and said variable capacity load of pumped liquid, and automatically activated means responsive to the demand of said load for controlling the consumption of power of the prime mover."

"12. In a liquid driven diaphragm fluid pump of the character described wherein the diaphragm has limiting positions of movement in the pump housing, a reciprocating piston in said housing for driving a mass of liquid for driving said diaphragm, means for controlling the quantity of the liquid in said housing comprising, a source of driving liquid, liquid supply valve means in liquid communication between said source and the mass of liquid, means for biasing said supply valve means to closed position and being opened by relatively low liquid pressure, liquid vent valve means in liquid communication with the mass of liquid and liquid low pressure outlet for said vent valve means, said vent valve means being biased to closed position and being opened by pressure exerted by the driving liquid when said exerted pressure exceeds the pressure of the pumped fluid by a predetermined degree of pressure, and valve means on the pumped fluid side of the diaphragm for controlling the delivery of pumped fluid and including a closable pumped fluid port, said control valve means, when closed, causing operation of said vent valve means at one limiting position of the diaphragm."

13. On the day before plaintiff rested, the following occurred:

"THE COURT: Well, I mean, let's simplify it ultimately. You are relying

If the defendants' interpretation of the court's directed verdict were correct, there would have been no occasion for defendants to spend an entire week of trial putting in their defense. They would have asked for and received a directed verdict on claims 23 and 19. That they did not lends support to our conclusion. We find no merit in defendants' argument on appeal that the judge's direction of a verdict on all claims except 23 and 19 should foreclose recovery for infringement of the two claims he obviously intended to preserve.

### III.

■ Defendants correctly point out that "cavitation cooling" is an element of the patented invention even though those words do not appear in the claims. Defendants adduced evidence indicating that the temperature of the fluid in their pump increases from about 68° to 124° during standby operation. Since the operation resulted in heating the fluid, it is argued either (a) that a patent which requires "cooling" cannot have been infringed, or (b) that if "heating" is construed as infringing the "cooling claim," the claim is invalid for vagueness.

We regard these arguments as little more than a play on words. As we understand the "cooling" concept, whether by cavitation or by circulation through a heat exchanger, it merely involves the removal of some heat that would otherwise cause a higher temperature. Conceivably, without cavitation cooling, the temperature of the liquid in defendants' pump during the standby operation would increase much more than it does; if so, the system tended to avoid overheating; we believe minimizing heating is "cooling" within the meaning of the patent specifications.[14] We find no merit in the contention that a cooling system must necessarily cause a temperature decline.

### IV.

On June 14, 1967, plaintiff granted a license under the '845 patent to Lake Erie Machine Company (LEMCO). LEMCO is not a party to this litigation and the position it may occupy in any relevant market is not indicated by the record. The LEMCO license agreement contains the following provision:

"A. During the life of this Agreement or any extension or continuation thereof, LEMCO agrees not to contest the validity of

on 19 by virtue of the fact 19 embraces 12 and to the extent that it embraces 12, right?

"MR. PETHERBRIDGE: Yes.

"THE COURT: And the other patent, 23, to the extent that it embraces 22, and 22 embraces 1?

"MR. PETHERBRIDGE: Right.

"THE COURT: By reference. It is a reference.

"MR. PETHERBRIDGE: Right, so that you have a complete claim, and the claim here then in the suit—the first patent in suit—Claim 23 is a combination claim embracing all of the elements set forth in 21, 22 and 23." A. 165. The next day, when plaintiff completed its case, this colloquy occurred:

"THE COURT: What are the motions?

"MR. SHULMAN: We move for a directed verdict, first of all, on all claims of the −845 patent except claim 23, which defendant has conceded—

"THE COURT: I mean with the exception that 23 embraces 22 and 1.

"MR. SHULMAN: It embraces them by reference, but 22 by itself and 1 by itself, they are not asserting, is that right?

"MR. PETHERBRIDGE: For the purposes of this trial only, we are asserting the infringement of that composite claim.

"MR. SHULMAN: It is only one claim.

"THE COURT: In regard to the −845 patent you are only asserting Claim 23.

"MR. PETHERBRIDGE: Yes.

"MR. SUSMAN: As it incorporates by reference.

"THE COURT: That is what the issue is in regard to from now on." A. 166.

14. As plaintiff's expert testified, a fan is "cooling" an automobile radiator even though its temperature may be rising as a car is being driven. See Tr. 1127.

PANTHER Patent Number 3,254,845 or any continuation, divisions or reissues thereof or any corresponding foreign patents, provided however that no royalties shall become payable under this Agreement on subject matter of claims after a finding of invalidity of such claims by any competent court of final Appellate Jurisdiction."

In Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, decided in 1969, the Supreme Court held that a licensee is not estopped to challenge the validity of a patent; in view of that holding, the "no contest" provision in the LEMCO license is plainly unenforceable.[15] Defendants would therefore have us conclude that such a provision in a license is a "misuse" of the patent which forecloses recovery of damages for infringement by a non-licensee.

A fair evaluation of defendants' argument requires us to identify two different lines of authority. The first is "the series of decisions in which the Court has condemned attempts to broaden the physical or temporal scope of the patent monopoly." Blonder-Tongue Laboratories, Inc. v. University Foundation, 402 U.S. 313, 343, 91 S.Ct. 1434, 1450, 28 L. Ed.2d 788. It is this line of cases in which the "misuse" doctrine developed. "A second group of authorities encourage authoritative testing of patent validity." Id. at 344, 91 S.Ct. at 1451. Although the Court explained that the Lear opinion relied on both lines of authority, it expressly stated that its

"holding that licensee estoppel was no longer tenable was rooted in the second line of cases eliminating obstacles to suit by those disposed to challenge the validity of a patent." Id. at 345, 91 S. Ct. at 1451. In our opinion neither of these two lines of cases justifies the application of the "misuse" doctrine in this case.

We have recently recognized the force of the policy of encouraging authoritative testing of patent validity. Business Forms Finishing Service, Inc. v. Glowiak, 452 F.2d 70 (7th Cir. 1971). That policy, however, is not served by a rule which enables an infringer to escape liability without challenging the validity of a patent.

■ The policy underlying the misuse doctrine is designed to prevent a patentee from projecting the *economic* effect of his admittedly valid grant beyond the limits of his legal monopoly.[16] Misuse of the patentee's economic monopoly no doubt would have made the "no contest" clause in the LEMCO license unenforceable even before Lear was decided, but the cases limiting the manner in which a patentee may exploit his monopoly contain no suggestion that the existence of such a clause should itself be considered a "misuse."

Although the Supreme Court has unequivocally condemned the use of a patent as a beachhead from which competition in unrelated lines of commerce may be assaulted, it has also recognized that a patentee has a right to a full monopoly return on the invention which he has discovered and disclosed to the public.[17]

---

15. Plaintiff does not dispute this proposition. Note also the Court's comment on the provision in the *Lear* license requiring payment of royalties by the licensee until the patent is held invalid:

"The parties' contract, however, is no more controlling on this issue than is the State's doctrine of estoppel, which is also rooted in contract principles." 395 U.S. at 673, 89 S.Ct. at 1912.

16. See Mercoid v. Mid-Continent Investment Co., 320 U.S. 661, 680, 64 S.Ct. 268, 88 L.Ed. 376 (Mr. Justice Jackson dissenting). See also the cases cited in Blonder-Tongue Laboratories, Inc. v. University Foundation, 402 U.S. 313, 344 n. 40, 91 S.Ct. 1434, 28 L.Ed.2d 788, particularly Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363.

17. An early precursor of the *Lear* holding recognized not only that it is "important to the public that competition should not be repressed by worthless patents," but also "that the patentee of a really valuable invention should be protected in his

It is his right to that return which provides the incentive for invention and disclosure which the entire patent system is designed to encourage. A fair appraisal of the policy considerations which underlie the patent system itself, in our view, makes it inappropriate to preclude enforcement of a valid patent against an infringing non-licensee simply because an unenforceable provision has been included in a patent license agreement.

■ The case would, of course, present a different issue if either the license provision or the patentee's exploitation of his patent produced economic consequences raising serious questions under the antitrust laws. Such questions were present in United States v. Singer Mfg. Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823,[18] and were raised in Bendix Corporation v. Balax, Inc.,[19] 421 F.2d 809, 819–821 (7th Cir. 1970), but are not present here.[20] We hold that the "no contest" clause in the LEMCO license, though unenforceable under *Lear*, does not constitute the kind of "misuse" of the patent which forecloses recovery of damages from an unlicensed infringer.

## V.

■ The jury assessed damages of $150,000 against the corporate defendant. Defendant contends that this award was excessive.

Plaintiff's evidence indicated that its exclusive licensee paid a royalty of $75 per machine and that defendant sold 2,641 infringing machines. Plaintiff therefore argued that it should recover at least $198,000 ($75 x 2,641). The jury's award was about 75% of that amount.

Defendant argues that the $75 negotiated rate was for an exclusive license; that its machines sold for a much lower price than the licensee's; and that a reasonable royalty should not exceed 5%, whereas the $75 rate applied to its sales would amount to 22%. Plaintiff replies that the percentages are misleading because different levels of distribution may be involved and, in any event, the statute merely makes the reasonable royalty a minimum measure of damages.[21]

No question is raised about the form of the trial judge's instructions on the

---

monopoly." See Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234, 12 S.Ct. 632, 636, 36 L.Ed. 414.

18. Defendants rely heavily on the footnote in Mr. Justice White's concurring opinion, 374 U.S. at 200, 83 S.Ct. 1773, as indicating that the subsequent decision in *Lear* should have been anticipated by plaintiff when the LEMCO license was executed. That argument, assuming its validity, does not affect our analysis of the misuse issue. In the *Singer* case, the court found a violation of the Sherman Act involving an agreement between competitors to exclude Japanese machines from the American market and to assist each other in a collective endeavor to obtain the broadest possible patent monopoly.

19. The counterclaim in *Bendix* alleged that a network of restrictive sales agreements "smothered most competition" in 75% of the swaging tap market. Without deciding the sufficiency of the allegation of a Sherman Act violation or "the relevance, if any, of *Lear*," we decided that the

antitrust issues "should be first presented to the trial court for its consideration." 421 F.2d at 820–821.

20. Defendants argue that the clause exceeds the limit of the monopoly grant because it precludes a challenge to "any continuation, divisions or reissues," as well as to the '845 patent itself. But the license granted to LEMCO also broadly covered "patent extensions, reissues, and renewals and any patents issuing thereon . . . ," and the no contest commitment terminated with the expiration of the license. See PX–69. Defendants make no claim that plaintiff has violated the antitrust laws.

21. 35 U.S.C. § 284 provides in part:
"Upon finding for the claimant the court shall award the claimant damages *adequate to compensate* for the infringement, *but in no event less than a reasonable royalty* for the use made of the invention by the infringer, together with interest and costs as fixed by the court. . . ." (Emphasis added.)

damage issue. The question for us is not what the damage award should be, but rather whether the amount awarded by the jury is supported by the record. We conclude that it is.

## VI.

The jury assessed damages of $5,000 against each of the individual defendants. All of the infringing pumps, however, were manufactured and sold by the corporate defendant. The individual defendants participated in the infringement in their capacity as officers and agents of the corporation. There is no suggestion in the record that the corporation is not financially responsible or that the individuals derived any direct benefit from the infringement.

The individual liability of managing officers of a corporation for acts of infringement committed by the corporation under their general direction was considered in depth in Dangler v. Imperial Machine Co., 11 F.2d 945, 946–948 (7th Cir. 1926).

"Respecting the liability of officers of a corporation for its infringements of letters patent, the authorities are not in accord. The weight of authority, it seems, denies such liability in the ordinary case. That is to say, if the officers act merely as officers, they are not liable jointly with the corporation. It is only when the officers act outside the scope of their official duties that they become liable. * * * There are, however, numerous authorities that hold the managing officers liable for damages committed by the corporation in case of infringements. The enforcement of this liability is seldom sought, except in case of insolvency of the corporation.

"These latter holdings are on the theory that the corporation commits the tort only under the direction of the managing officers, and therefore these officers, including the directors who authorize the manufacture and sale of the infringing devices, are liable.

\* \* \* \* \* \*

"The latter view seems to have the support of the text writers. Robinson on Patents, § 912; Walker on Patents, §§ 410–412. This court has heretofore taken the position first announced, namely, that the officers are not liable unless they act outside the scope of their official duties. Cazier v. Mackie-Lovejoy Mfg. Co., 138 F. 654, 71 C.C.A. 104; Reed v. Cropp Concrete Mach. Co., 225 F. 764, 141 C.C.A. 90.

\* \* \* \* \* \*

"After due consideration of the various authorities, as well as the reasons back of the two positions, we adhere to the Cazier v. Mackie-Lovejoy Mfg. Co. decision, and hold that, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. The uncertainty surrounding the questions of validity and infringement make any other rule unduly harsh and oppressive.

"It is when the officer acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability—that officers are held jointly with the company. \* \* \* "

■ We adhere to *Dangler* and find no "special showing" in this record to support an award of damages against the individual defendants. The damage recovery against the corporate defendant will adequately compensate the plaintiff for the acts of infringement shown by the evidence.

The judgment against the individual defendants is reversed; the judgment against the corporate defendant is affirmed. Costs shall be taxed against the corporate defendant.